**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Peter Porter

     v.                                        Civil No. 14-cv-166-LM
                                                        Opinion No. 2015 DNH 234
United States of America


**O R D E R**

On July 9, 2010, Peter Porter was injured at the United
States Post Office in Claremont, New Hampshire, when a loading
dock ramp unexpectedly struck him in the back.  Porter has
brought suit against the United States of America, alleging a
claim of negligence under the Federal Tort Claims Act ("FTCA"),
28 U.S.C. §§ 2671 et seq.

The court held a three-day bench trial in November 2015.
After considering the trial testimony and the record evidence,
the court concludes that the government was not negligent in
maintaining the ramps.  The court further concludes that, even
if the government were negligent, Porter was also negligent in
failing to exercise due care, and that Porter's negligence
exceeded any negligence on the part of the government.  The
court's findings of fact and rulings of law are set forth below.
See Fed. R. Civ. P. 52(a).

**Findings of Fact**

The court found Porter to be a credible witness.  His
testimony about the accident, how it occurred, and his injuries
thereafter was consistent and believable.  As a result, the
court's findings of fact are drawn almost exclusively from
Porter's testimony, except where necessary for background
information or to clarify certain facts.

Peter Porter began working for Mowers News Service
("Mowers") as a delivery driver in April 2010.  Mowers is a
contractor that delivers mail between postal facilities in
northern New Hampshire and Vermont.  Mowers assigned Porter to
three delivery routes, each of which involved stops at several
postal facilities.  As was customary at Mowers, Porter was
trained by experienced Mowers drivers.  A different driver
trained Porter for each route.  Porter had been working for
Mowers for approximately three months when, on July 9, 2010, he
was struck by a loading dock ramp while delivering mail to the
Claremont, New Hampshire, Post Office.

A.    Claremont Post Office

The loading dock at the Claremont Post Office is a large,
concrete platform that is approximately 32 or 33 inches high.
The loading dock is used by delivery drivers, who back their

2

delivery trucks to the front of the dock and load and unload postal containers from it.  Two yellow bumpers, as far apart as the width of a typical delivery truck and taller than the loading dock, sit on the ground just in front of the dock.  The bumpers are designed to prevent the delivery truck from backing into the loading dock during a delivery.  When a truck is backed up to the bumpers during a delivery, there is somewhere between one and two feet between the loading dock and the back of the truck.[1]

The loading dock has a built-in hydraulic lift designed to be raised or lowered to meet the level of whatever truck is being loaded or unloaded.  The lift has handrails on both the right and left sides.

Two ramps are attached to the front of the lift.  Each ramp is about three feet long and three feet wide and weighs between 80 and 100 pounds.  The ramps are upright when not in use and lowered into position during loading.  The ramps are designed to be raised and lowered independently, but they are attached to

---

[1]Although there was testimony concerning the distance between the loading dock and the edge of the bumpers, there was no credible testimony as to the exact measurement.  The court's finding that a truck backed up to the bumpers would leave approximately one to two feet between the dock and the back of the truck is based on pictures of the loading dock, entered as exhibits, and testimony at trial.

the same axle.  In other words, when working properly, a driver
can lower one of the ramps without the other ramp moving.

The ramps are used to form a bridge between the lift and
the truck so that drivers can move postal containers off the
truck and onto the dock, and vice versa.  The ramps can be
raised and lowered to rest against the bed of the delivery truck
by using "snap chains," which are metal chains attached to the
lift handrails on one end and the ramps on the other end.  The
snap chains can be slotted into hooks on the handrails, which
lock the ramps in place.  Even without being locked in place,
however, the ramps are not designed to fall over absent a driver
making an effort to lower them.  While in the upright position,
the ramps rest at a slight angle toward the lift and away from
the front of the dock, so that the ramps will not fall forward
on their own.

B.   Porter's Training for the Claremont Post Office

George Sunn, an experienced Mowers driver, trained Porter
on the delivery procedure for the Claremont Post Office.  The
training consisted of Porter observing Sunn go through the
normal delivery procedures for one delivery.  Porter described
his training as "monkey see, monkey do."  Based on his
observation of Sunn, Porter created a checklist.

4

During the training, Sunn backed up the truck to the yellow bumpers in front of the loading dock.  Sunn next got out of the truck, went around to the back, and opened the door.  Sunn showed Porter how to raise and lower the loading dock lift, how to raise and lower the ramps by using the snap chains, and how to transfer postal containers to and from his delivery truck using the lowered ramps as a bridge.  Sunn did not explicitly tell Porter that the ramps should be lowered using the snap chains while standing behind the ramps on the lift.  Nor did Sunn explicitly tell Porter not to lower the ramps while standing in front of them.

During Porter's experience making deliveries for Mowers prior to July 9, 2010, he observed drivers use different techniques for raising and lowering the ramps at the various postal facilities.  Some, like Sunn, raised and lowered the ramps using the snap chains.  Other drivers would stand on the lift and kick the ramps to knock them over, or ram a postal container into both ramps to knock them over at the same time. The latter techniques were used most often by Porter and other drivers at facilities where the snap chains were broken.  Under those circumstances, Porter and other drivers would raise the ramps at the end of the delivery by standing on the ground and pushing the ramps back into the upright position.

At no point during Porter's training or experience as a Mowers driver did he observe anyone attempt to lower one or both of the ramps at any facility while standing in front of one of the ramps or while standing on the ground.  During Porter's training and experience as a Mowers driver, Porter observed every other driver lower the ramps, in some manner, while standing behind the ramps on the lift.  No witness testified that he or she had ever seen or heard of any delivery driver lowering a ramp from the ground.

C.   Issues with the Ramps at the Claremont Post Office

For the most part, deliveries at the Claremont Post Office, of which there were about six to eight a day, occurred without incident, and the ramps at the post office worked as intended. About three or four times a year, however, drivers would complain to a post office employee that the ramps were "rough," in that they could not be raised or lowered easily.  The roughness was generally caused either by cold weather or by gravel or debris getting stuck in the axle.  The roughness of the ramps was usually resolved by a driver applying WD-40 to the ramp axles.  A can of WD-40 was left on the loading dock for that purpose.

6

The Claremont Post Office used the United States Postal Service maintenance department in Manchester, New Hampshire to maintain its equipment.  From at least the fall of 2009 through July 9, 2010, no one at the Claremont Post Office made a maintenance call regarding the ramps.

On July 8, 2010, Sunn reported to Kristin Kiernan, the Postmaster at the Claremont Post Office, that the ramps were rough going down and could not be completely lowered.[2]  Sunn applied WD-40 to the ramp axle, and he was then able to raise and lower the ramps without difficulty.  After Sunn resolved the issue, Kiernan did not receive any other complaints on July 8 concerning difficulties raising or lowering the ramps.

Porter offered the testimony of a former Claremont Post Office employee, Jerome Goggin, to support his argument that the Claremont Post Office had notice on July 8 of other problems with the ramps.  Goggin testified that on the morning of July 8, he noticed that both ramps were resting in the lowered position. Goggin testified that he raised each ramp, but neither would

---

[2]Although Kiernan did not testify as to who raised the complaint concerning the ramps on July 8, Sunn testified that he brought the issue to Kiernan's attention.  Sunn's testimony is supported by a "Motor Vehicle Accident Information Collection Form" ("Accident Information Collection Form"), Plaintiff's Exhibit 20, which was completed on July 9, 2010, following Porter's accident.  The form states that Sunn told Kiernan about an issue with the ramps on July 8.

stay in the upright position.  He testified that he then
reported the issue to Kiernan, and she was unable to get the
ramps to remain in the upright position.  Goggin also testified
that he did not know how or whether the issue with the ramps was
resolved.

The court does not credit Goggin's testimony about the
ramps falling forward on July 8.  First, Goggin's version of the
problem with the ramps is contradicted by the other evidence in
the record, including Kiernan's and Sunn's testimony, as well as
the Accident Information Collection Form completed the day of
Porter's accident.  If Goggin's version of events were true, and
the ramps could not remain upright, deliveries to the Claremont
Post Office would have come to a halt on July 8, as drivers
would have been unable to back their trucks up to the dock.
There was no evidence in the record to that effect.  Indeed,
there was evidence to the contrary.  As discussed below, Porter
testified that the ramps were in working order during his first
delivery on July 9.  A second reason the court does not credit
Goggin's testimony about the condition of the ramps on July 8 is
his admitted animus toward Kiernan, with whom he had an
acrimonious workplace relationship.  The court finds that
Goggin's animus toward Kiernan caused him to embellish his
testimony and exaggerate his role on July 8.

8

D.   <u>Porter's Accident</u>

At about 4:45 a.m. on July 9, 2010, Porter arrived at the Claremont Post Office.  As he had done approximately thirty times before, Porter followed his usual procedure.  He backed his truck up to the yellow bumpers in front of the loading dock, and then got out and raised the back door of his truck.  Porter next climbed the stairs to the loading dock, got onto the lift, raised it to a height about even with his truck, and lowered the ramps onto his truck bed from behind the ramps using the snap chains.  He then used the ramps as a bridge to his truck, and transferred the postal container from his truck onto the loading dock and into the post office.  When he finished making his delivery, he returned to the lift, lowered it to its original height, pulled up the ramps by the snap chains, pulled the door to the back of his truck down, and proceeded to the next postal facility on his route.

Later on the morning of July 9, at approximately 6:45 a.m., Porter made a second delivery at the Claremont Post Office.  As with his earlier delivery, Porter backed his truck up to the yellow bumpers in front of the loading dock, got out, and raised the back door of the truck.  Unlike Porter's first trip to the Claremont Post Office that morning, there was a postal container on the loading dock.  Porter pushed the postal container onto

the lift and raised the lift to a height approximately equal to his truck.  As with his prior deliveries to the Claremont Post Office, Porter was aware that the ramps were not secured in place.

Porter was planning to push both ramps down onto his truck bed using the postal container.  Just before he did so, however, he noticed that his truck door was not fully opened, and was not high enough for the postal container to fit underneath.  Porter stepped off the back of the lift onto the ground, and stood between the back of his truck and the loading dock.  Porter then raised his truck's back door to the top.

Rather than return to his position on the lift and lower the ramps from behind, as he had always done in the past, Porter chose to lower the ramps from the front where he was standing on the ground.  Standing in front of the left ramp (as you face the ramps from the ground), Porter put his left hand between the two ramps, and pulled the right ramp down.  When he did, the left ramp also came down, striking him on the back.

Porter immediately went inside the post office and reported the problem with the ramps and his injury.  Kiernan, who arrived around fifteen minutes after the accident, asked Porter to demonstrate how the accident happened.  She also asked Porter to lift up the back of his shirt, and she took a photograph of a

10

small red contusion on his lower back, which was the only mark
she saw.

Porter continued to make deliveries for Mowers for a few
weeks after the accident.  Because of pain and discomfort in his
back and neck, Porter stopped working in late July 2010.  Since
that time, he has undergone surgeries on both his cervical and
lumbar spine, and sought treatment for pain in his neck and
back.  The testimony at trial, including that of Porter and his
physician, Dr. Joseph Michael Phillips, credibly established
that the accident at the Claremont Post Office caused the neck
and back pain Porter has suffered since July 9, 2010.

## Legal Standards

The FTCA vests district courts with exclusive jurisdiction
to hear

> civil actions on claims against the United States, for
> money damages . . . for injury or loss of property, or
> personal injury or death caused by the negligent or
> wrongful act or omission of any employee of the
> Government . . . under circumstances where the United
> States, if a private person, would be liable to the
> claimant in accordance with the law of the place where
> the act or omission occurred.

28 U.S.C. § 1346(b)(1).  Here, because the acts or omissions
giving rise to Porter's claim occurred in New Hampshire, the
substantive law of New Hampshire governs this lawsuit.

González-Rucci v. United States I.N.S., 539 F.3d 66, 69 (1st Cir. 2008).

To prove negligence under New Hampshire law, a plaintiff "must demonstrate that the defendant had a duty to the plaintiff, that she breached that duty, and that the breach proximately caused injury to the plaintiff." England v. Brianas, 166 N.H. 369, 371 (2014).  Duty in a negligence case depends on "what risks, if any, are reasonably foreseeable under the particular circumstances." Macie v. Helms, 156 N.H. 222, 224 (2007).

"[A]s a general proposition, business owners have a duty to protect and/or warn their customers, employees, and business invitees against known and reasonably foreseeable dangers on the premises." Werst v. Wal-Mart Stores, Inc., No. 09-cv-392-SM, 2011 WL 4711900, at *3 (D.N.H. Oct. 4, 2011).  In Rallis v. Demoulas Super Markets, Inc., the New Hampshire Supreme Court defined this duty as follows:

> [P]remises owners are governed by the test of
> reasonable care under all the circumstances in the
> maintenance and operation of their premises.  A
> premises owner owes a duty to entrants to use ordinary
> care to keep the premises in a reasonably safe
> condition, to warn entrants of dangerous conditions[,]
> and to take reasonable precautions to protect them
> against foreseeable dangers arising out of the
> arrangements or use of the premises.  Accordingly,
> under New Hampshire law, a premises owner is subject
> to liability for harm caused to entrants on the

> premises if the harm results either from: (1) the
> owner's failure to carry out his activities with
> reasonable care; or (2) the owner's failure to remedy
> or give warning of a dangerous condition of which he
> knows or in the exercise of reasonable care should
> know.

159 N.H. 95, 99 (2009) (citing Restatement (Second) of Torts §§ 341A, 343 (1965) (further citations omitted)). A dangerous condition is one that "involves an unreasonable risk of harm." Restatement (Second) of Torts § 342(a). "A landowner does not have a duty to warn or instruct of a dangerous condition on the premises if it is open and obvious." McCarthy v. Weathervane Seafoods, No. 10-cv-395-JD, 2011 WL 2174036, at *2 (D.N.H. June 1, 2011) (internal citation omitted); see also Allen v. Dover Co-Recreational Softball League, 148 N.H. 407, 422 (2002).

In its answer to Porter's complaint, the government asserted a defense of comparative negligence. Under New Hampshire law, if the plaintiff is more at fault for his injuries than the defendant, his claim is barred. N.H. Rev. Stat. Ann. § 507:7-d. A comparative default defense "'is triggered by a plaintiff's negligence,' which 'involves a breach of the duty to care for oneself.'" Boucher v. CVS/Pharmacy, Inc., 822 F. Supp. 2d 98, 104 (D.N.H. 2011) (quoting Broughton v. Proulx, 152 N.H. 549, 558 (2005)). "To determine whether . . . a duty of care has been breached, an examination of what

13

reasonable prudence would demand under similar circumstances is required." White v. Asplundh Tree Expert Co., 151 N.H. 544, 547 (2005).

**Rulings of Law**

Based on the legal standards applicable to Porter's claim under the FTCA, the court concludes, in the first instance, that the government was not negligent.  However, to the extent there was any negligence on the government's part, Porter's own negligence clearly exceeded that of the government.  A detailed summary follows.

A.   The Government's Negligence

Porter's claim is based on the second theory of liability identified in Rallis – the government's failure to remedy or give warning of a dangerous condition of which it knows or in the exercise of reasonable care should know.[3]  The court

---

[3]The first theory of liability in Rallis, the owner's failure to carry out his activities with reasonable care, does not apply to this case, as Porter was not injured by Claremont Post Office employees' activities.  See, e.g., Restatement (Second) of Torts 341A cmt. d (discussing examples of liability for failure to carry out activities with reasonable care, such as where a plaintiff is injured by careless workers during the course of their work, or where a defendant landowner injures a plaintiff by driving too fast on his private road).

concludes that the government was not negligent under that
theory.

The evidence shows that the Claremont Post Office did not
have knowledge of any issue concerning the ramps moving down
together, rather than independently, prior to July 9, 2010.
Although the Claremont Post Office received three or four
complaints a year that the ramps were rough going up or down,
there were no complaints, prior to Porter's injury, concerning
the failure of the ramps to move independently.[4]

Although Sunn reported an issue with the ramps to Kiernan
on July 8, 2010, the day before Porter's accident, Sunn's report
was that the ramps were not raising or lowering easily.  After
Sunn applied WD-40 to the ramps, he was able to raise and lower
them without difficulty, and Kiernan testified that she did not
receive any further reports concerning problems with the ramps
for the rest of that day.  And, the ramps worked as intended
during Porter's first delivery at the Claremont Post Office on
July 9, 2010.

There is no evidence that prior to Porter's accident anyone
at the Claremont Post Office knew, or should have known, that

---

[4]To the extent that Goggin's complaint concerned the ramps
moving together rather than independently, that complaint is not
credible for the reasons already explained.

the ramps were moving together rather than independently.
Without some evidence of the government's actual or constructive
knowledge of the allegedly dangerous condition on its premises,
the government cannot be liable for having failed to remedy or
warn the drivers of the condition.

Moreover, even if the government knew or should have known
that the ramps might not move independently prior to Porter's
accident, there is no evidence the ramps' failure to move
independently represented a dangerous condition.  Testimony from
several witnesses establishes that: (i) Porter had never seen
anyone attempt to lower a loading dock ramp from anywhere other
than above and behind the ramps; (ii) Earl Bushor, the owner of
Mowers, had never seen or heard of one of his drivers ever
attempting to lower a loading dock ramp from the ground; and
(iii) no one at the Claremont Post Office had ever seen anyone
attempt to lower the ramps from the ground.  Further, there is
no evidence in the record that anyone could be hurt by the ramps
not moving independently unless the driver did what Porter did:
attempt to lower the ramps while standing on the ground.

In sum, the evidence establishes that the delivery drivers
lowered the ramps from behind while standing on the lift, and
that no Claremont Post Office employee ever contemplated that a
driver would attempt to lower the ramps from the ground while

16

standing in front of them.  The fact that the ramps moved together rather than independently on July 9, 2010, created a risk only to Porter, who, by lowering the ramps from the ground, did something not reasonably foreseeable.

Therefore, even if the government knew or should have known that the ramps were moving together rather than independently prior to Porter's accident, the government could not have foreseen that a delivery driver would attempt to lower the ramps as Porter did on July 9, 2010.  Thus, the condition of the ramps on July 9, 2010, was not a dangerous condition reasonably foreseeable to the government.

Accordingly, the court concludes that the government did not fail in its duty to protect Porter against known and reasonably foreseeable dangers on the premises.  Therefore, the government was not negligent.

B.   Porter's Comparative Negligence

Even if the government were negligent for failing to ensure that the ramps moved independently, Porter would not be entitled to judgment because his negligence was greater than any negligence on the part of the government.  As described above, during his second delivery to the Claremont Post Office on July 9, 2010, Porter attempted to lower the right ramp, while

17

standing on the ground in front of the left ramp, and by grabbing the right ramp and yanking it down.  Porter knew at the time he grabbed the right ramp that neither ramp was locked in place.

At that point, Porter had made thirty deliveries to the Claremont Post Office and many deliveries to other postal facilities on his routes.  During those deliveries, he (i) had never attempted to lower a loading dock ramp in such a manner, (ii) had never seen anyone else lower a loading dock ramp in such a manner, and (iii) had never been told that lowering a loading dock ramp in such a manner was appropriate.

Porter takes the position that he was not negligent for two reasons.  Porter first argues that because no one ever told him the exact proper procedure for lowering the ramps, he is not at fault for having lowered the ramps as he did.  Porter next argues that had the ramps been working properly, they would have moved independently of one another and would not have fallen on him.  Neither of those facts, however, absolves Porter of fault for the accident.

1.   Explicit Directions About Lowering the Ramps

Although no one at Mowers or the Claremont Post Office explicitly told Porter not to operate the ramps while standing in front of them, it is clear that Porter knew – from both his training and his experience at Mowers - that the proper procedure for lowering the ramps at a postal facility was to stand above and behind them on the lift.  While Porter testified that drivers at the various facilities lowered the ramps in several ways – using the snap chains, kicking down the ramps, or pushing the ramps down with a postal container – he also testified that he had never seen another driver attempt to lower a ramp from the front while standing on the ground.

With respect to Porter's training at the Claremont Post Office, Porter watched Sunn make a single delivery.  During that delivery, Sunn lowered the ramps while standing on the lift using the snap chains.  Porter described his training as "monkey see, monkey do."  Had Porter followed the procedure he witnessed during his training, he would have lowered the ramps at the Claremont Post Office while standing on the lift.

Notwithstanding his minimal training, it should have been obvious to Porter that lowering a ramp from the ground would place him in harm's way.  Every other witness familiar with the Claremont Post Office loading dock testified that no driver ever

19

lowered the ramps from the ground.  The court finds that no other driver lowered the ramps in that manner because the danger to any driver of using such a procedure was open and obvious.

The danger was open and obvious for several reasons. First, the ramps themselves are metal and each weighs between 80 and 100 pounds.  Thus, a reasonable driver would not place himself underneath them as Porter did.  Second, Porter knew at the time he grabbed the right ramp that neither ramp was locked or otherwise secured in place.  Thus, Porter knew at the time he put his hand between the ramps to pull one down that the other was relying solely on gravity to keep it from falling forward onto him.  Third, and finally, although there was just enough room for Porter's body to fit, there was very little space between the dock and Porter's truck.  Porter knew or should have known that it was dangerous to place himself in the small space between the dock and the back of his truck while lowering the ramps.[5]

In sum, Porter is correct that neither Mowers nor the Claremont Post Office explicitly told him that he should not lower the ramps from the ground.  However, that omission did not

---

[5]Even Porter himself admitted surprise that he did not suffer a head injury as a result of his precarious location when the ramp fell on him.

obviate Porter's duty to use common sense and avoid obvious dangers.[6]

### 2.  Ramps not Moving Independently

Porter asserts that he was not negligent because the ramps moved together rather than independently.  It is true that the ramps appear to have moved together rather than independently at the time of Porter's accident.  That fact, however, does not excuse Porter's decisions to stand below and in front of two 80 to 100 pound ramps, which he knew were not secured in place, and to pull one of them down toward him.  Nothing required Porter to lower the ramps from the ground.  Indeed, Porter's only justification for doing so was that the ramps were "right there."[7]

In sum, Porter did not exercise reasonable care when he decided to lower the ramps from the front while standing on the

---

[6]Necessarily, Sunn and the other Mowers drivers who trained Porter would not point out every improper procedure for making a delivery.  Under Porter's theory, however, he would be absolved of fault for doing anything during a delivery unless he was explicitly warned not to do so.

[7]Arguably, lowering the ramps one at a time from the ground would have taken Porter more time than simply returning to the lift and knocking both ramps over at the same time with the postal container, as he had originally intended.  Moreover, Porter's method for lowering the ramps did not eliminate his need to go back up on the dock to move the postal container onto his truck.

ground.  Moreover, even were the court to find negligence on the government's part (for failing to "fix" the ramps or to warn Porter), the court would find that Porter's negligence in failing to act with reasonable care exceeded any negligence on the government's part.

## Conclusion

For the foregoing reasons, the court finds and rules in favor of the defendant.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

December 22, 2015

cc:  Robert J. Rabuck, Esq.
     Christine Rousseau, Esq.